## S. C. GILLELAND, *et al.*, V. P. C. SCHUYLER, *et al.*

1. STATUTES; *Effect of Repeal.* The ordinary effect of a repeal of a statute is to put an end to all proceedings under it, pending and undetermined.

2. ———— *Legislature; Binding Successor.* In the matter of pure legislation, and where nothing results in the nature of contract or vested rights, no one legislature can bind another.

3. ELECTIONS; *Right to Contest.* The right to contest an election is not a vested right. Given by one legislature, it may be taken away by another.

4. CONSTRUCTION OF STATUTES; *Ch.* 104, *Gen. Stat.* 1868. Chapter 104 of the General Statutes has a prospective application, and until repealed prescribes the rules for determining the effect and construction of the statutes of each legislature.

5. ———— *Ch.* 79, *Laws of* 1871. The repeal by the legislature of 1871 of the act of 1869 for contesting an election for the location or relocation of county seats, did not put an end to proceedings in contests then pending under said act.

6. EVIDENCE; *Hearsay; Declaration of Voter.* On the trial of a contested county-seat election a witness cannot be allowed to state what other persons not parties to the record told him subsequent to the election, as to the number of times and the names under which they claimed to have voted.

7. ———— *Error; When Hearsay Evidence not Immaterial.* Where testimony is erroneously received, which may have influenced the court or jury in the findings or verdict, the error cannot be considered immaterial.

8. ELECTIONS; *Conduct of; Irregularities.* Mere irregularities on the part of election officers, or their omission to observe some merely directory provision of the law, will not vitiate the election.

9. ———— *Statutory Rules; When directory.* Unless a fair consideration of the statute shows that the legislature intended compliance with the provision in relation to the manner, to be essential to the validity of the proceeding, it is to be regarded as directory merely. (*Jones v. The State,* 1 Kas., 279, approved.)

10. ELECTION BOARD; *Judges; Clerks; Officers de facto.* An election is valid, though there be but two judges appointed or acting. That one of the judges was not present at the polls when elected, and that the clerks were not appointed by the judges, will not vitiate the election when the judges recognized the clerks as properly acting, and both judges and clerks acted during the election, receiving the ballots, counting the votes, and making

the returns without any question by any one as to their authority.   They were at least officers *de facto,* and their acts as such officers cannot be questioned collaterally.

11. FINDINGS; VERDICT; *To be supported by Proof, not Inference.*   Evidence of a preparation and an opportunity for, and an inclination to, wrong-doing, are not of themselves sufficient to sustain a finding of such wrong-doing.

12. ELECTIONS; *Challenging Voter; Place where Held; Intoxicating Liquors.* Sections 10, 18, and 64 of the general election law, (ch. 36, Gen. Stat.,) relating to the challenging of persons offering to vote, the right of can-didates and electors to be present in the room where the votes are received, and prohibiting the keeping and selling intoxicating liquors at the elec-tion polls, are directory in their provisions, and a disregard of them will not necessarily vitiate an election.

13. ELECTION BOARD; *Official Misconduct.*   Election officers who willfully neglect or corruptly act in the discharge of any duty under the election laws, are liable to prosecution and punishment for misdemeanor.

## *Error from Osage District Court.*

THIS is a proceeding to contest an election held for the purpose of relocating the county-seat of Osage county.   The election was called and held under the provisions of ch. 26, Gen. Stat. of 1868.   The towns contesting are Burlingame and Lyndon.   The election was held on the 18th of October 1870.   The board of county commissioners canvassed the votes, certifying that 1145 were cast in favor of Lyndon, 997 in favor of Burlingame, and two votes in favor of Keithville; that Lyndon had received a majority of 146 votes, proclamation of which result was duly made.   On the 28th of October 1870, *P. C. Schuyler, O. H. Sheldon,* and *L. Empie,* citizens and electors of the town of Burlingame, filed in the office of the clerk of the district court the notice and bond required by § 2, ch. 27, Laws of 1869, for contest-ing the said county-seat election.   Notice of said contest was published, as required by § 3 of said act; and on the 17th of November thereafter *S. C. Gilleland, L. D. Bailey, Horace W. James,* and eighty other citizens and electors of Lyndon, filed in said clerk's office a counter bond, as provided by § 3 of said act.   (Said § 3 provides that "The persons filing the

notice shall be deemed the plaintiffs, and the persons filing the counter bond shall be deemed the defendants.") A commissioner was appointed, and testimony taken, as provided by §§ 4, 5, and 6 of said act, and the cause was continued until the September Term 1871, when it came on for trial. By ch. 79 of the laws of 1871, (approved March 3d, and published March 16th, 1871,) said ch. 27, Laws of 1869, was *repealed*. Defendants moved to dismiss the action, claiming that the contest proceeding was terminated by the repeal of the law by which it was authorized, and under which it was commenced. The court overruled the motion, and proceeded to try the case. One of the grounds of contest, and the principal one, was, that "at the said election at the Lyndon precinct, fraud was practiced by the board of election of said precinct to such an extent as to render the whole election null and void." The Lyndon poll-books showed that 420 votes were cast at that precinct in favor of Lyndon, and one vote was cast in favor of Burlingame, for the county-seat. The district court made separate findings of fact, (of which those that are material will be found in the opinion;) and as conclusions of law the district court found, "That said election held on the 18th of October 1870 was and is illegal, fraudulent and void, so far as the voting precinct of Lyndon, in said Osage county, was and is concerned," and "that the town of Burlingame is now the legal county-seat of Osage county." New trial refused, and judgment in accordance with the findings. The defendants bring the case here on error.

*C. B. Mason*, and *Thacher & Banks*, for plaintiffs in error:

1. The court erred in permitting witnesses to testify to conversations had with, and declarations made by, various persons, on the pretense that such persons were partisans of one side or the other. It is not pretended that these declarations were made by persons at the polls conducting the election, and under such circumstances as to become a part of the *res gestæ;* but they were declarations of persons made as to past transactions. Such testimony is the merest hear-

say, and not admissible under any rule of law known to judicial tribunals. *People v. Cicott*, 16 Mich., 284.

If it be contended that such testimony did not affect the finding, we answer that it is the only testimony in any respect casting or pretending to cast a doubt upon the result of the election at Lyndon, and the only testimony casting a suspicion upon any vote cast thereat excepting the votes of Doctors Pine and Calhoun, and one person who is alleged to have repeated his vote. It evidently had weight with the judge who tried the cause, for without some testimony of such character it is utterly impossible to account for the conclusions reached by him in his decision as finally made.

2. The findings of the court upon questions of fact are open to very grave criticism, in regard to the general conduct of the election, and the refusal to regard the pretended challenges of voters. It nowhere appears that the man whose vote was challenged was a voter or not. The record does not show a word of testimony that the judges of election acted in unison with persons outside of the election room "who contended that no person from Burlingame had a right to be in the room during the reception of votes, or to challenge voters," and a man from Burlingame was in the room a part of the time. The witness Place testifies—"So far as I could see, everything in the election room was done in a fair manner." And another witness affirms the same thing. The only witness who speaks of challenging is Rambo, and he testifies, and the whole case goes to show, that he abandoned any attention to the challenge.

To the tenth finding plaintiffs in error would request the particular attention of the court. They had supposed it the duty of the law-makers to throw around the election the guards which were to preserve its purity; that whatever opportunities for the commission of frauds were shown to have existed, were entitled to little or no weight, so long as fraud was *not proven*. The question is not one of opportunity, but of guilt—proven guilt. The court below judicially attempts the disfranchisement of a voting precinct of 420 voters

simply because, although unimproved, an opportunity was given them to commit a wrong. It is believed that there is no reported case where such an attempt has before been made. Other courts have looked simply to the question of preserving to the elector the effect of his ballot. And such is the purpose of our election law: Gen. Stat., ch. 36, §§ 85, 86. That irregularities, and even fraud of the judges or inspectors of election, will not deprive voters of their ballots, see 1 Ore., 123; 10 Minn., 107; 11 Mich., 362; 29 Ill., 54, 413; 29 Cal., 214; 10 Iowa, 210; 8 N. Y., 67.

An election is the ascertaining of the sovereign will of the people upon a given question. It is nothing more. The people are sovereign. As such, nothing can be granted to them by legislative enactment, as they create the legislature. The people, in matters of law, are omnipotent. When they speak, their voice is a fiat. They make and unmake constitutions and governments. They create nations, and, if they so will, nations are again resolved into their first elements. Legislatures may resolve and enact as they list; no enactments or resolves of theirs can stand opposed to the fiat of the people. In our political organization it has been thought policy, upon certain questions, to ask for this voice of the people. Yearly they express it in the choice of officers and representatives, and occasionally upon other questions, as in the instance at bar. It is comparatively an insignificant one, yet the voice is none the less potential. It is the voice of sovereignty none the less. The polls, the officers presiding, the returns, the various formulas, are all simply *the means* which an organized government has provided for collecting and ascertaining the "will of the people." It is no fulfillment of a grant of power by the legislature to individuals, to allow them, as a favor, to do certain things provided they are done pursuant to the conditions of the grant; but it is the voice of sovereignty, speaking the will of sovereign power. The purpose, then, is to ascertain that will. All the machinery of an election is contrived simply with that end in view, and when that will is ascertained it is the mandate that must govern individuals,

both private and official, as well as judicial tribunals; and this is the spirit of all the adjudications.

The court by its finding declares this election at Lyndon fraudulent and void. How fraudulent? If the voice there expressed is the voice of the people, wherein can the fraud consist? To start with, the officers of the election certify to the result, and such certificate is presumptive evidence, to be overthrown only by actual proof of a different result; that is, that the legal votes cast actually produced a different result. 5 Hill, 44. That it is the voice of the people can only be controverted by showing that the votes there cast were cast by other than legal voters, and that the legal certificate does not state the fact. This is not attempted. It is not pretended that there were other than legal votes there cast sufficient to change the result. Wherein lies the fraud? How is the certificate of the officers falsified? Will it be answered that the clerks were not properly appointed — that they were elected? Supposing the Pope himself had nominated them, and the judges of election had thereupon accepted and sworn them in: would it then be claimed that they were not legally in office? If it is alleged that but two judges of election were chosen and sworn in, we answer: How does that tend to establish fraud? In what way would another judge have increased the vote for Burlingame, or lessened that for Lyndon? It is shown to have been owing to a misconception of the law by the justice that another was not elected. Fraud is a crime, and not to be predicated upon a mistake. Besides, the act of omission is one wholly immaterial. The statute is directory. 21 Wis., 595; 14 Barb., 261; 3 Mich., 233; 29 Ill., 424; 51 Ill., 149; 20 Pick., 492; 30 Cal., 173.

By his eighth finding of fact the learned judge has found that "The judges and clerks of said Lyndon precinct at said election were *partisans* for the town of Lyndon, and had an interest in having the county-seat of said Osage county located at said town of Lyndon." There is not one particle of evidence to warrant this finding; yet without anything going to establish the material bearing of the fact upon the matter at issue,

the learned judge has found that these officers had an *interest* in the election, and were partisans. But it is believed that were the finding authorized by the proof, it yet affords no ground upon which to predicate the final charge that the election is fraudulent and void. Were it so, what election would or could be legal?

3. But says the court, "The polls were opened and the election held at the said Lyndon voting precinct in a building in which spirituous, vinous and fermented liquors were kept and sold before and during the time of holding said election in said voting precinct," etc. Well, admitting this to be true, it furnishes no evidence of fraud which should render the election so held void. Nor is it prohibited by statute in such manner as to render the expression of the will of the people any the less certain and determined, where that expression is clearly ascertained. It is a fact which cannot change the result of the election, or render that result doubtful. The sale of liquor on election day, the bribery of voters, the voting by a person more than once, the giving of fraudulent tickets to voters, the making of a wager upon the result, the false personating of a voter, and various other acts, are prohibited by law; but will it be contended that the doing of all these, by partisans of either side, will avoid an election, unless the result is thereby changed? If so, it is not the *majority* which must control, but the purity of action of one side or the other: and how shall we settle that question? The law has not provided a means. But it is provided by § 2 of the election law that the election shall be held at such place in said district as the trustee and any justice of the peace shall direct. And it does not appear that either of the judges of election at Lyndon had aught to do with the selection of the place for holding the election at that precinct. The statute is directory. It fails to provide that if a poll shall be opened contrary to its provisions, the vote polled thereat shall be void. 19 Wend., 142; Dwarris, 221; 34 Barb., 620. Besides this, the parties have shown that,

except for the happening of the alleged irregularities, the result would have been different. 3 Hill, 46; 20 Wend., 12.

4. The court erred in refusing to dismiss the proceedings on motion of the plaintiffs in error. The proceeding was commenced under a statute of 1869, which was repealed before the case was tried: Ch. 79, Laws of 1871, § 10. It will not be disputed that the repeal of the act by the statute of 1871 is as full and complete as language can make it. This proceeding is alone authorized by the act of 1869. It is purely statutory. Without that express statute it could not have been had, but the party would have been forced to resort to other means of redress for his fancied injuries. Such being the fact, it is submitted that a repeal of the statute utterly obliterates it as a law, and makes it as though it had never been, excepting as to proceedings had and determined under it. 4 Kas., 489. All proceedings commenced under and by virtue of the statute are put an end to by the repeal, unless saved by the repealing statute by special exception. Dwarris, 153; 1 Hill, 325; 9 Barn. & Cress., 751; 11 Pick., 350. By the terms of the statute of 1871 nothing is saved; but the repeal is full, complete and absolute, and another and entirely different statute is enacted, the proceedings under which are radically different from those under the statute of 1869. Standing upon these two statutes, it is believed that there can be no doubt but that the law of 1871 put an end to this litigation. But it is insisted by defendants in error that by ch. 104, Gen. Stat., the suit is not abated, but may go on to final judgment, notwithstanding the legislature have, in express terms, taken away the power to do so. In other words, that the legislature of 1868 have, by a law by them enacted, put it out of the power of future legislatures to give to a repealing statute its ordinary legal force. Laying out of view entirely the question that the statute of 1868 was intended to apply simply to the statutes enacted by that legislature, and assenting to the proposition that the legislature meant to apply their rule to future legislatures, had they the power? The legislative power is vested in the senate and house of repre-

sentatives. It needs no argument to prove that each particular legislature has equal power with any of its predecessors, else in time the whole legislative power might become absorbed. One legislature can in no way circumscribe the action of another, but each acts under the constitution, with powers unimpaired and unimpairable, except by the sovereign will which gave them existence—the people. Dwarris, 75; 6 Cranch, 335; 4 Cow., 556; 3 McLean, 285; 2 Story, 561; 14 Wis., 623.

*Ellis Lewis,* for defendants in error:

1. The findings of the court below, if correct, show the most corrupt and reckless disregard of every safeguard provided by the law for securing a fair election; that both the judges of election at the Lyndon precinct, and the leading citizens of Lyndon, combined and determined, at all hazards, to carry the election; and that their exertions were not only applied at the Lyndon precinct but they extended their operations to the Douglas precinct, and that they caused a large number of illegal votes to be polled at that precinct. The preparations at Lyndon were made the evening before the election was held, by persons acting in the interest of Lyndon, for the perpetration of fraud, and its concealment after it was perpetrated. On election day the election law was completely ignored, and nothing was left undone to achieve their object in carrying the election. In the language of the court below, " The plan pursued at said election at said precinct afforded ample opportunity for perpetrating the greatest frauds, and no adequate, if any, means for detecting them." All these things were done by *persons seeking to derive a benefit* from them, and certainly were sufficient to cast an uncertainty over the result.

To sustain the validity of such an election, it is urged in behalf of plaintiffs in error, that the provisions of the election law, without exception, are directory, and that the judges of election cannot by their "neglect, misconduct or contumacious refusal" to obey them disfranchise or cause the disfranchise-

37

ment of those legally entitled to vote. As to the doctrine already established by this court as to how far the provisions of the election laws are to be held directory, and for a review of the case of the *People v. Cook*, 14 Barb., 259, we refer to the case of *Jones v. The State*, 1 Kas., 273. In this case the doctrine "that statutory requisitions are deemed directory only when they relate to some immaterial matter," is approved. That election officers may cause the disfranchisement of legal voters, see 33 Cal., 55. See also, Lead. Cas. on Elections, 493; 20 Penn. St., 493; 15 Ohio St., 535; 2 Swan, 68.

2. Section 64 of the election law, prohibiting the holding of elections at or in any building in which "intoxicating liquors are kept or sold," is *negative* and prohibitory; and directory statutes are not couched in negative terms. Negative statutes are imperative. In what stronger terms could the legislature have prohibited the holding of an election in a building in which intoxicating liquors were sold? The election at the Lyndon precinct was held in *precisely such a building* as the law prohibits to be used. The law says "no election shall be held;" and we maintain that no legal election was held at that precinct on the 18th of October 1870, and that the court below was correct in its decision that the election at that precinct was void.

3. In reference to the point that there were but two judges either appointed, chosen or acting at the Lyndon precinct, we have to say that by § 3 of the general election law the township trustee and any two justices of the peace constitute the judges of election, and in their absence judges of election are chosen by the electors present, and constitute an election board, and are called an "election board" in § 22 of said act, and a majority of whom can act under subdivision 4th of § 1, ch. 104, Gen. Stat. See *Schenck v. Gray & Bliss*, Woolworth's Ct. Ct. Rep., and 1 Miller's Decis., 175, 190.

4. There was no error in refusing to dismiss the cause, for the reason that the statute under which its commencement was authorized was repealed during the pendency of the suit, by another statute which contained no saving clause in refer-

-ence to pending suits. Ch. 104, § 1, Gen. Stat.; 4 Kas., 498.

The opinion of the court was delivered by

BREWER, J.: This is a contest over an election for the relocation of the county-seat of Osage county, and the question which meets us on the threshold is, as to the effect on this proceeding in contest of the repeal, prior to its determination, of the statute under which it was had. The proceeding was commenced under ch. 27 of Laws of 1869, p. 101, which act provides fully for all proceedings in the case, including that of a review by this court. In other words, it is a statute providing for the contest of elections of this kind, giving a remedy by proceeding otherwise unknown to the law. After suit commenced, issue was joined therein as provided by this peculiar statute of 1869, and a large volume of testimony was taken to substantiate the issue so joined. Continuances were had until the time of the final trial, at which a motion was made to dismiss the proceeding, on the grounds that the statute authorizing the proceeding had been repealed. (Laws of 1871, ch. 79, § 10, p. 194.) The court denied the motion, and an exception was duly taken. It will not be disputed that the repeal of the act by the statute of 1871 is as full and complete as language can

1. Repeal of statutes; effect of.

make it. "Is hereby repealed," is the language used. This proceeding is alone authorized by the act of 1869. It is purely statutory. Without that express statute it could not have been had, but the party would have been forced to resort to other means of redress for his supposed injuries. It will not be denied that the ordinary effect of the repeal of a statute is to put an end to all proceedings under it, then pending and undetermined. So that unless there be something to take this out of the ordinary rule, the point is well made, and the proceeding should have been dismissed. Chap. 104 of Gen. Stat., p. 998, is entitled "an act concerning the construction of statutes." It is, so far at least as any question here is concerned, simply a

continuation of the law of 1859. It purports to contain rules for determining the meaning and extent of certain words and phrases when used in the statutes, as well as the effect of certain acts and doings of the legislature. The first section commences in this way: "In the construction of the statutes of this state, the following rules shall be observed, unless such construction would be inconsistent with the manifest intent of the legislature, or repugnant to the context of the statute: First, The repeal of a statute does not revive a statute previously repealed, nor does such repeal affect any right which accrued, any duty imposed, any penalty incurred, *nor any proceeding commenced,* under or by virtue of the statute repealed." Two questions are made: What is the effect of this statute on after legislation? and, What is the power of the legislature in this direction? In regard to the latter question it may be conceded that each legislature is supreme and independent of those preceding, so far as matters of naked legislation are concerned; and where nothing results in the nature of contracts, or vested rights, no one legislature can bind another. In determining its rules of procedure, the effect of its enactments, in deciding what past laws shall stand, and what be repealed, each legislature is free and absolute. "Of no validity and void are, it is alleged, such acts as affect to bind future parliaments:" Dwarris, 75. "One legislature cannot abridge the powers of a succeeding legislature:" Per Marshall, C. J., in *Fletcher v. Peck,* 6 Cranch, 335. The right to contest an election is no vested right. Given by one legislature, it may be taken away by another. Even the commencement of a contest gives no vested right to complete it. "*In medias res,*" a legislature may intervene, repeal the statute, and terminate the litigation. The power of the legislature of 1871 to stop this proceeding in contest, by a repeal of the statute under which it was pending, is therefore beyond controversy. Returning now to the first question, we inquire as to the effect of the statute cited (ch. 104, Gen. Stat.,) on after legis-

*2. Legislature; binding successor.*

*3. Right to contest elections.*

lation. The repeal of a statute does not affect "any pro-

**4. Ch. 104, Gen. Stat., has prospective application.**
ceedings commenced." ' The plain import of this language is, that any proceeding commenced under a statute may be prosecuted to completion, notwithstanding the repeal of such statute. To what does this language refer? the present, alone, or both the present and future? Does it apply only to laws then in force, or is it also prospective in its operation, and applicable to all future legislation until it is itself in terms repealed? A careful examination of the whole statute seems to us to clearly show that it was intended to be of prospective and permanent application. By it the legislature laid down certain rules to guide in the interpretation of all legislation, present and future. Of course the rules themselves are subject to future legislative supervision and repeal; but unchanged, and unrepealed, subsequent legislation must be understood as made with reference to and upon the basis of them. They constitute a set of *quasi* legislative by-laws. For instance, the twenty-seventh clause recites that "the phrase, 'under legal disability,' includes persons within the age of minority, or of unsound mind, or imprisoned." By it therefore, whenever in any subsequent law that phrase is used, it will be understood that all these different classes of persons are meant. If a legislature wishes to exclude any one of these classes from the provisions of a law it is passing, it must use some other phrase than "under legal disability," or use some words or terms of exclusion, or change the present statutory definition. A legislature leaving these rules and definitions unchanged, virtually re-enacts and continues them. By this no power is ascribed to one legislature which is denied to a subsequent; but granted the power to change, or repeal, a failure to do either implies an intention to continue them in

**5. Ch. 79, 1871; its effect on pending proceedings.**
force. Hence it seems to us, that if the legislature of 1871 intended to stop all proceedings then pending under the contest-law of 1869, it should have added a clause in terms ending such proceedings, or else suspended or repealed the law of 1868 so far as it declared

the effect of a repeal of a statute. The case stands thus: A law is in force declaring that the repeal of a statute shall not affect proceedings already commenced. Proceedings are commenced. The statute is then repealed. Can we say that the legislature intended more, by that repeal, than the law declared should be the effect of a repeal? We think not; and hence hold that there was no error in overruling the motion to dismiss the proceeding.

II. The next question that meets us is made on the admission of testimony. A witness for defendants in error, Eli Crane, testified that he was at Lyndon on the day of the election. He further testified: "I first saw Dr. Calhoun. He was a resident of Lyndon, and a property-owner, and postmaster there. I think he was interesting himself in the election." Question by plaintiff's counsel: "What remarks were addressed to you by him that day?" Objected to as incompetent, and hearsay testimony. The objection was overruled, and defendants excepted. Other questions of like nature were asked, objections of the same kind raised, and like rulings and exceptions; and in response the witness testified substantially, that the Doctor invited him to go over to Douglas precinct with a party, and vote there under assumed names. He subsequently testified that the party went and thus voted. Again the witness, after testifying that a person residing at Lyndon voted at Douglas precinct, was asked: "Do you know from his own statements under what name he voted?" Objected to as hearsay, overruled, and exceptions. Answer — "He told me 'R. Crum.'" Q.—"What statement did he make as to the number of times he voted, at that time or within a day or two?" Objected to as incompetent and hearsay testimony. Objection overruled, and exception. Answer—"He stated to me on the same day that he had voted five times that day." Still again the same witness, against defendants' "objection and exception," was allowed to state the conversations of various persons whilst returning from the election at Douglas precinct, and as to their voting, and the number of votes cast by

6. Hearsay; declaration of voter.

them. That so much of this testimony as purports to give the statements of third parties as to the number of times and the names under which they had voted, is hearsay, and incompetent, seems to us clear. It is the testimony of what other persons told the witness, persons not parties to the suit, so that their admission could be receivable. These declarations were not made at the polls by persons conducting the election, and so as to make part of the *res gestæ;* nor do they accompany a principal fact which they serve to qualify or explain. They are simply statements concerning past transactions by strangers to the record. They come within none of the exceptions to the rule which excludes hearsay testimony. It was perfectly legitimate and competent to prove the casting of fraudulent votes, but it was not competent to prove that fact by the statements of parties who claimed to have cast them. It may be said that the contest was between Lyndon and Burlingame, and that all persons supporting either were principals on the one side or the other. But this is true no more in case of a contest between *towns* for the county-seat, than between *individuals* for an office. Surely, a candidate for the office of governor would hardly feel that all who voted for him so far represented him that in case of a contest their admissions and statements could bind him on the question of fraudulent votes. No more is it true in the present case. We have examined the cases of *People v. Pease,* 27 N. Y., 45; *State v. Olin,* 23 Wis., 319, and the note in 3 McCord, 230; and so far as they enunciate any principle contrary to the doctrines here announced we disapprove them. It may be said that the testimony was immaterial,

7. Testimony when not immaterial. and that the error worked no substantial injury to the plaintiffs in error, because, first, there was sufficient testimony without this to support the findings, and secondly, there was no finding that these specific fraudulent votes, or indeed that any fraudulent votes, were cast. The rule that requires this court to sustain the findings of the district court unless clearly against the weight of evidence avoids the first reason, for we cannot say how much this

testimony influenced the court in its findings, nor determine whether without it the findings would have been as they are. If testimony is erroneously received which may have influenced the court or jury in the findings or verdict, we cannot call the error immaterial. The findings or verdict must be based upon nothing but competent testimony before any presumption in favor of their correctness will arise in this court. For, otherwise, the court or jury may, disbelieving the witnesses who give competent testimony, reach their determination mainly or wholly on the incompetent evidence, and so a party obtain a judgment he is not in fact entitled to. The record must be clean, which, when passed upon by court or jury, is sought to be sustained in this court because it has been so passed upon. Nor is the second reason sufficient, for while there is no finding of the casting of specific fraudulent votes, the findings show that the learned judge of the district court was convinced of a fraudulent combination in Lyndon to carry the election, a combination to which the judges and clerks of election, as well as voters, were parties, and the testimony of this witness Crane, if competent, tends strongly towards proving such combination. We are led therefore to the conclusion that this testimony was incompetent, and the error substantial. This would be sufficient to compel a reversal of the judgment.

We might stop here, but there are questions presented in the record, and discussed by counsel in their briefs, which will arise on a second trial of this case, and which therefore demand our consideration. The result of the election as shown by the canvass of the county commissioners was a majority of 146 votes for Lyndon. At Lyndon precinct 421 votes were counted, of which all but one were for Lyndon. Rejecting the votes cast at Lyndon, Burlingame received a majority. The conclusion of law reached by the district court was, that the election "was fraudulent, illegal, and void, so far as the voting precinct of Lyndon was concerned," and that therefore Burlingame remained the county-seat. Those findings of fact upon which the district judge based his

conclusion that the election at Lyndon was illegal, are as follows:

3d.—(In substance, that the election was held in a building in which liquor was sold, though in an adjoining room, and one separated from the election-room by a partition without door or other passage.)

"4th.—The votes at said election at said precinct were received through a space in the sash of the front window left after removing one pane of glass, which said pane of glass had been removed from said window for that purpose, the space so left being 12 by 14 or 16 inches, and that the said front window with the exception of the space so left as aforesaid, was darkened or obscured by paint, or some other substance, in such a manner that no person on the outside could see what proceedings were being had on the inside of said room during said election, except through said space left open as aforesaid, and very frequently not through this space whilst persons were voting.

"5th.—That said window was so darkened or obscured at the instance and request of a person who was actively engaged in said election, in the interest of the town of Lyndon for county-seat of said Osage county, and on the evening before said election, and with a view of holding the said election.

"6th.—That the friends of Burlingame were not afforded a full and fair opportunity of challenging votes at said precinct at said election, or of free access into the room where such election was held during the voting, or of seeing how the election was conducted inside the room, but were permitted to be present at and during the canvassing of the votes polled at said precinct. That the judges of election at said precinct were implicated in this hindrance, and seemed to act in unison with the parties outside who contended that no one from Burlingame had a right to be in the room during the voting, or had a right to challenge votes at said Lyndon precinct at said election.

"7th.—That no attention was given by the judges of election at said Lyndon precinct during said election to challenges of votes when made by the friends of Burlingame.

"8th.—The judges and clerks at said Lyndon precinct, at said election, were partisans for the town of Lyndon, and had an interest in having the county-seat of said Osage county located at said town of Lyndon.

"9th.—That persons in the interest of the said town of

Lyndon were allowed free access to the room where the voting was conducted at said election at said precinct during the holding of such election.

"10th.—That the plan pursued at said election at said precinct afforded ample opportunity for perpetrating the grossest frauds, and afforded no adequate if any means of detecting them."

13th, 14th, 15th, 16th.—(In substance, that there were three voting precincts in the township in which Lyndon was situated, and that the township trustee, and one of the two justices of the peace of said township, were acting as judges in the other precincts.)

"17th.—That there were but two judges of election either elected, appointed, qualified, or acting at said Lyndon precinct at said election on the 18th of October 1870, and that one of such judges was R. H. Wynne, one of the justices of the peace for said municipal township, and the other of such judges was Moses Bradford, sr.; that said Bradford was not present among the bystanders at the polls when he was elected as such judge, but was elected by the persons at the polls, and afterwards notified of such election, after which he appeared, was qualified, and acted.

"18th.—That the clerks of election at said election at said Lyndon precinct were not appointed or selected by the judges of election at said precinct."

These are all the findings of fact which bear upon the question of fraud or illegality in the election at Lyndon. Questions affecting the purity of elections are in this country of vital importance. Upon them hangs the experiment of self-government. The problem is to secure, first, to the voter a free, untrammeled vote; and secondly, a correct record and return of the vote. It is mainly with reference to these two results that the rules for conducting elections are prescribed by the legislative power. But these rules are only means. The end is the freedom and purity of the election. To hold these rules all mandatory, and essential to a valid election, is to subordinate substance to form, the end to the means. Yet on the other hand, to permit a total neglect of all the requirements of the statute, and still sustain the proceedings, is to forego the lessons of experience, and invite a disregard of all those pro-

8. Elections; mere irregularities will not vitiate.

visions which the wisdom of years has found conducive to the purity of the ballot-box. Ignorance, inadvertence, mistake, or even intentional wrong on the part of local officials, should not be permitted to disfranchise a district. Yet rules, uniformity of procedure, are as essential to secure truth and exactness in elections as in anything else. Irregularities invite and conceal fraud. "That a mere irregularity on the part of the election officers, or their omission to observe some merely directory provision of the law, will not vitiate the poll, is a point sustained by the whole current of authorities; but there has existed a great conflict of opinion as to what is an irregularity, and what is matter of substance." Leading Cases on Elections, Brightly, p. 448. The rule is thus laid down by this court in the case of *Jones v. The State,* 1 Kas., 279: "Unless a fair consideration of the statute shows that the legislature intended compliance with the provision in relation to the manner to be essential to the validity of the proceedings, it is to be regarded as directory merely." Following the rule thus laid down, which seems to us to state the law succinctly and clearly, let us examine these different facts found and see how far they sustain the conclusion. We will reverse the order in which they are stated by the district court. And first, as to the irregularity in the mode of appointing or electing the clerks and judges, and the fact that there were but two judges qualified or acting. How the clerks secured their positions we are not told. They should have been appointed by the judges. Gen. Stat., 404, § 3. They were not. Yet the judges accepted them as clerks, recognized them as such. One of the judges was so *de jure.* Both judges and clerks were officers *de facto.* They formed an election board. They were recognized as such by all persons having occasion to deal with an election board during the whole term of office of such board. Their acts as such officers can no more be questioned, collaterally, now, than can the acts of one who has served as mayor of a city during a term of two years, with the general recognition of community, be questioned.

*9. Statutory rules; when directory.*

.after the expiration of such term. The manner of their elec-

**10. Election board; where only two judges act. Officers de facto.** tion or appointment is merged in their assumption of power, and the public recognition of their right. The shortness of their term of office does not affect the rule. They were officers *de facto* during the whole of the term. In *Sprague v. Norway,* 31 Cal., 174, the inspectors were appointed by the judges, and not by the electors present, as required by law. Still they were held officers *de facto,* and the election was sustained. And in *State v. Stumpf,* 21 Wis., 579, two inspectors acted instead of the statutory board of three. But the provision of the statute was declared directory, and the election valid. See also, *People v. Cook,* 14 Barb., 285–289, and 8 N. Y., 67; *People v. Hilliard,* 29 Ill., 423; *Dishon v. Smith,* 10 Iowa, 220; *McKimmey v. O'Connor,* 26 Texas, 5; *Thompson v. Ewing,* 1 Brewster, 99; *McCraw v. Harrolson,* 4 Cold., 34; *Boilearis v. Case,* 2 Parsons, 503; *People v. Cicott,* 16 Mich., 324. Secondly, concerning those findings which are simply that there were both preparations and opportunities for and

**11. Wrongdoing is matter of proof, not inference.** inclinations to fraud, it is enough to say that they of themselves alone amount to little or nothing. You can never infer guilt from simply a preparation, and an opportunity for, or an inclination to crime. They may be important to sustain or explain the direct or *circumstantial* proof of the fact of crime. It is in that view, doubtless, that they were introduced into these findings by the learned judge who tried this case; and we refer to them simply lest our silence might be misconstrued on a second trial into an intimation that they were sufficient to sustain the conclusion. Thirdly, as to the findings that the judges refused to permit the friends of Burlingame to

**12. Challenges; right of; construction of statute.** be present in the room during the reception of votes, and refused to recognize the challenges made by them. Section 18 of the election law (Gen. Stat., p. 408,) directs the judges to permit the candidates or their friends, not exceeding three, to be present in the room during the time of receiving and counting the

votes.  Section 10 of the same law requires the judges, whenever one offering to vote is challenged by an elector, to administer to him a certain specified oath, and then question him as to his qualifications.  The requirements of these two sections were disregarded.  Did this vitiate the election? Are these sections mandatory, or directory?  Applying the rule laid down as above, we cannot look at these provisions as other than directory.  They do not seem in the nature of things essential to the validity of the election.  There may even be occasions where a disregard of them is almost or quite a necessity.  Suppose the election be appointed and held in a room so small that the judges and clerks, with their tables and election boxes, fill it; must § 18 be observed, or the election rendered void?  Or again: suppose the only candidates or friends of candidates who apply for admission are filthy and foul with the fumes of tobacco and rum; can they not be refused admittance, without peril of the election? Or again: suppose it be evident that an attempt is made by challenging everybody, whether well-known citizens or otherwise, to delay the voting, so as to prevent some from casting their ballots; must the judges stop because of a challenge to administer an oath and put questions to one whom they know has been an old-time elector and citizen?  These requirements of the statute are, therefore, as we think, directory.  A willful and corrupt disregard of them would subject the officers to prosecution and punishment.  But even such a disregard would not necessarily vitiate the election, or deprive the legal electors of their vote.  It might be shown, affirmatively, that none but legal votes were in fact received, or counted, and then the corrupt misconduct of the officers would work no injury to any but themselves.  *People v. Cook,* 14 Barb., 290, 293; *People v. McMannus,* 34 Barb., 620; *People v. Sackett,* 14 Mich., 320; *Taylor v. Taylor,* 10 Minn., 107.  Lastly, the election was held in a building in which intoxicating liquor was sold.  This is forbidden by the statute, (Gen. Stat., 420, § 64,) which reads: "No poll shall be opened, or election held, in this state, at or in any building

Gilleland v. Schuyler.

in which spirituous, vinous, fermented, or other intoxicating
liquors, are kept or sold." That one of the great
evils attendant upon elections, (particularly in
our cities,) is the use of intoxicating liquors to
influence such elections, all will admit. Many a thoughtful
man has gone away from the polls at the end of an exciting
election deeply pondering whether after all free government be
not yet simply an experiment, with the evidences strongly
pointing to failure. We would not wish to weaken any of the
safeguards the legislature has erected against this pernicious
influence. Yet no more in this, than in any other case, may
we allow our thoughts and wishes, as to what the law ought
to be, to control our judgment as to what it is. We do not
legislate. We simply expound and decide. The legislature
has forbidden the holding of an election in a building where
liquor is kept or sold. No penalty is attached by the legis-
lature. Can we attach any? If we could, to whom should
we attach it, the innocent or the guilty? The electors do not
designate the place. The trustee and justice do. Whom
should we punish? Shall we punish the innocent electors,
and deprive them of their franchise, because their ballots are
received in a room whose selection they had no power to
influence? Before we impute such intention to the legisla-
ture, we ought to find plain warrant therefor in their lan-
guage. The trustee designating the place of election is the
party violating the law. He ought to suffer the penalty.
He cannot plead ignorance of the law. The business of
selling liquor is conducted so openly he can hardly be unaware
of the places where it is done. If therefore he locates the
election in a saloon, or in a building in which is a saloon,
he ought to suffer the penalty. No authority is given to
any one to change the polls, if they have been located
in an improper place. The argument made, and the au-
thorities cited by counsel for defendants in error, to the
effect that time and place are of the substance of an elec-
tion, do not apply to this case. It may be conceded, that
when a legislature has designated a particular day for a

popular election, an attempted election upon any other day would be void. The same is true when it has designated a place, and without necessity the place is changed. *Knowles v. Yeates*, 31 Cal., 82; *Chadwick v. Melvin*, Brightly Lead. Cas. on Elect., 251; *Jucker v. Commonwealth*, 20 Penn. St., 493; *Miller v. English*, 1 Zabr., 317. But here the legislature has not assumed to designate the place. It has committed that trust to certain officers, and the election has been held in the place they have designated. The complaint is, that the officers have designated an improper place, and not that the electors have assumed to disregard the selection of either the legislature, or any officer. Where the electors have not themselves broken the law, ought they to be disfranchised? Two other considerations worthy of mention sustain the view herein expressed, that this section is directory. One is, that notice of the time of the election must be posted up at the place appointed at least ten days before each special, and fifteen before each general election: Gen. Stat., p. 404, § 5. Now, even if the trustee has designated a room in a building in which at the time of designation no liquor was kept or sold, how can he prevent the occupation of other rooms in the building, prior to and on the day of election, for the sale of liquor? Surely, he is not compelled to secure a building with only one room, or else hire a whole building to protect the one room. The other is this: The *keeping* as well as the *sale* of liquor is within the terms of the prohibition; and the statute is silent as to quantity. One gill is equally with a barrel-full within the letter of the section. Nor is it made a question of *knowledge* on the part of the officers or electors, but one of *fact*. Can it be that the discovery, subsequent to an election, of the presence of a jug of whisky in some room of the building in which an election is held, even though ordinarily kept there by the occupant, will vitiate that election? On the whole case, therefore, we do not think the facts found warrant the conclusion.

The judgment of the district court will be reversed, and the case remanded for a new trial. On such trial, if illegal

votes were cast at Lyndon, or elsewhere, sufficient to change
the result, that fact may be shown, as well as any additional
circumstances tending to impeach the entire poll.

All the Justices concurring.