THE STATE OF KANSAS, *on the relation of J. A. Wilson, County Attorney*, v. THE BOARD OF COMMISSIONERS OF KEARNY COUNTY *et al.*

1. COUNTY-SEAT ELECTION — *Duty of New Board to Complete Canvass.* At the first election after the organization of K. county, held July 21, 1888, votes were cast for permanent county seat, and returns made from six precincts. The county board met to canvass the result of the election, when an order restraining them from canvassing the returns from two of the precincts was served upon them. Afterward they proceeded and canvassed the returns from four precincts, and upon that partial canvass certified that L. had received a majority of the votes cast for county seat. Within thirty days the restraining order was dissolved, the court holding that there was no just cause for its allowance; but the board did not then reconvene to complete the canvass. At the general election in November, 1888, a new county board was elected, and upon January 11, 1889, they convened as a canvassing board and canvassed the entire returns of the preceding July election, finding and declaring that no place had received a majority of the votes cast. *Held,* That it was the duty of the new board to meet and complete the canvass, and that it was proper and legal for it to do so without the command or compulsion of any court.

2. ORIGINAL RETURNS, *Lost — Duplicate Returns, Used.* Where the original returns of an election precinct have been lost or stolen from the county clerk's office and cannot be obtained, the board in making the canvass may use the duplicate returns retained in the township when they are properly identified as the genuine returns of the election.

3. SHERIFF — *Duty to Call Second Election.* The canvassing board having declared that no place had received a majority of the votes cast, it was the duty of the sheriff on his own motion to call and proclaim a second election for the permanent location of the county seat.

4. INJUNCTION — *No Bond Given — Void Order.* Before the calling of the second election a temporary order of injunction had been allowed against the sheriff, to prevent him from calling a second election, which was to take effect on the execution of an injunction bond. This bond was not given, and the order was therefore inoperative and void. (*The State, ex rel., v. Comm'rs of Rush Co.*, 35 Kas. 150.)

5. EVIDENCE *Sustains Finding.* The second election was held and the returns canvassed, when it was declared that H. had received a majority of the votes cast. Upon an examination of the testimony as to the honesty and legality of that election, the finding and declaration of the canvassing board are sustained.

*Original Proceeding in Mandamus.*

THE opinion, filed at the session of the court in December, 1889, states the material facts.

*J. M. Johnson, Ady & Nicholson,* and *J. A. Wilson,* for plaintiff.

*Leland J. Webb,* for defendants.

The opinion of the court was delivered by

JOHNSTON, J.: The purpose of this proceeding is to obtain a determination of what place is the county seat of Kearny county. The county was organized on March 27, 1888. At the same time the following officers were appointed by the governor, viz.: W. J. Price, H. A. W. Corfield and S. R. Hibbard, county commissioners; James H. Waterman, county clerk; and R. F. Thorne, sheriff; and the town of Lakin was designated as the temporary county seat. On July 21, 1888, the first election was held, for the purpose of choosing a permanent county seat and a full set of county officers. At the time of this election there were six election precincts in the county, viz.: Kearny, Kendall, Hibbard, Hartland, Lakin, and South Side. On July 27, 1888, the county clerk and county commissioners of the county convened for the purpose of canvassing the returns of the election, which had been received from the several precincts, when a restraining order, issued by the judge of the district court in an action brought in the name of the state, was served upon them, restraining the canvass of the returns from Kearny and Kendall precincts until the hearing of an application for a temporary injunction, which hearing was to take place on August 7, 1888. Upon service of this writ the canvassing board adjourned until August 17, 1888. The following day the chairman of the county commissioners, upon the request of the other two members, reconvened and resolved "That upon the advice of our attorneys it is our duty to canvass all returns not restrained; that we now proceed to do so." The canvass of the

returns from the townships of Lakin, Hartland, Hibbard, and South Side was then made, and it was ascertained that Lakin had received 358 votes, Hartland 140 votes, Omaha 120 votes, and Deerfield 1 vote. The returns from Kearny and Kendall precincts were not canvassed, and they caused an entry to be made upon the journal that these returns "were not canvassed, by reason of a restraining order granted by the Hon. A. J. Abbott, judge of the 27th judicial district." Following the abstract of votes which is set out upon their journal, the canvassing board certify that, according to the partial canvass as made, Lakin received a majority of the votes for permanent location of the county seat, but did not declare that any place was chosen as the permanent county seat. On August 24, 1888, the application for a temporary injunction in the action in which the restraining order was issued was heard before the district judge, and the injunction was refused, the court finding that there was no just cause or ground for the allowance of a temporary restraining order against the canvass of the votes of Kearny and Kendall townships, and the restraining order was dissolved. The canvassing board as then constituted did not reconvene upon the dissolution of the restraining order, to complete the canvass, and never took any further action on the returns from Kearny and Kendall precincts. On the same day that the restraining order was set aside, an action was brought by the county attorney in the name of the state against R. F. Thorne, the sheriff of Kearny county, to perpetually restrain and enjoin him and his successors in office from calling a new election for the permanent location of the county seat of Kearny county. A temporary order of injunction was allowed by the probate judge of Kearny county, which was to take effect after service on the defendant, and after the plaintiff had given a bond to the defendant in the sum of $200, to be approved by the clerk of the district court. No injunction bond was ever executed, and the action was finally dismissed on April 17, 1889. In August, 1888, the district judge, at chambers, allowed two peremptory writs of *mandamus* on the application of private

parties, commanding the county commissioners to canvass the votes of Kearny and Kendall precincts for county officers and for county seat, which were vacated by the district judge sitting at Garden City on November 5, 1888, but no record of this action was filed in Kearny county until April, 1889, when a *nunc pro tunc* order was entered. The county officers chosen at the first election hold until the next general election, and at the general election in November, 1888, a complete change of county officers was made by the defeat of the Lakin candidates and the election of the opposing ticket. The new board of county commissioners then elected, consisting of W. B. Logan, J. J. Clark and H. Grace, and D. H. Brown as county clerk, J. E. Duckworth as sheriff, and J. A. Wilson as county attorney, qualified at once and entered upon the duties of their respective offices. Among the first acts of the county commissioners and county clerk was to convene as a canvassing board, and complete the canvass of the vote had on July 21, 1888, for permanent county seat. This canvass was made on the 11th and 12th days of January, 1889, and the returns from Kearny and Kendall precincts, which had not been canvassed at the July meeting of the former board because of a restraining order, and which the former board had failed and neglected to reconvene and canvass, were canvassed. The result of the election as ascertained by the complete canvass was, that no town had received a majority of the votes cast, and that therefore no place had been chosen as permanent county seat of Kearny county. The vote is as follows: Lakin, 425; Hartland, 218; Omaha, 233; Deerfield; 1. When this canvass was made, the board found that the returns from Kearny precinct were missing, and the duplicate returns retained in the township were sent for, and used in making the canvass. The returns filed in the county clerk's office had been taken therefrom by the former clerk, James H. Waterman, and had thereafter been lost or stolen. After the declaration was made that no place had been chosen as permanent county seat, and on January 14, 1889, the sheriff issued a proclamation calling a sec-

ond election to determine the permanent county seat, to be held on February 19, 1889. In pursuance of this notice an election was held, and returns were made thereof from all the precincts in the county. The board, on February 22, 1889, met to canvass the returns, when, being served with a restraining order issued by the district judge in an action entitled "Frank P. Lindsay *v.* W. B. Logan *et al.,*" they adjourned the canvass to await the further action of the district court. On February 27, 1889, after the temporary restraining order had expired, they reassembled as a canvassing board, and canvassed the returns of the election of February 19, 1889, with the following result: Lakin received 144 votes, Hartland 371, Chantilly 96, Deerfield 65. The board thereupon certified that the city of Hartland had received a majority of 66 of all the votes cast, and declared it to be the permanent county seat of the county. Immediately following the declaration of this result, an injunction proceeding was instituted in the district court by an elector to contest the election of February 19, 1889, but after the commencement of the present proceeding that action was dismissed.

As will be seen from the foregoing recital, two elections are involved in this proceeding—that of July 21, 1888, and the one held on February 19, 1889. The plaintiff claims that no place received a majority of all the votes cast at the first election, and that when this result was ascertained, it was the duty of the sheriff to call a second election, as was done, and that at that election Hartland received a majority of all the votes cast. In behalf of some of the defendants it is claimed that Lakin is the permanent county seat by virtue of the July election, and that there was no authority to call or hold the February election. There is little, if any, contention over the integrity of the July election, or that the result as ascertained and declared at the second canvass was not correct. But while the defendants do not attack that election, they insist that there was no authority for the second canvass, because that on the first canvass Lakin was declared to have received a majority of the votes canvassed, and that this result has

never been contested or set aside by any competent tribunal, and that the result so ascertained, having been acquiesced in for several months, and until the new board was elected, cannot now be disturbed, and that the new board cannot of its own motion come together and make a second canvass. The duty of the first board to canvass the entire returns is clear, and that it did not finally do so is probably due to the partisan feeling of themselves and friends for the town of Lakin. The restraining order served on them when they first convened is a sufficient reason for delay until it was dissolved; but after that they should have reconvened and completed the canvass, which their own record shows was incomplete. According to the entries on their journal, the canvass of all the precincts was not made, because of the restraining order, and not because the returns were not regular and true; nor does the journal show that a formal declaration of what place had been chosen county seat was made by them, although it is claimed that such an order was made which was never entered; but in the view we take, this is unimportant. The canvassing board cannot tie its hands or defeat the will of the people by a mere declaration upon an incomplete canvass and by an adjournment. It was their duty to canvass all the returns after the injunction was removed, and that duty continued and rested equally upon their successors as upon themselves until it was performed. The fact that a board canvasses a part of the returns, declares the result, and adjourns *sine die*, will not relieve it from the duty imposed by statute, nor cut off the right of interested parties to have the board reassemble and perform their full duty. That this duty may be compelled after the dissolution of the canvassing board, is well settled in Kansas.

It is true, as counsel for defendants contends, that language is used in the case of *Light v. The State, ex rel.*, 14 Kas. 489, which supports to some extent the view urged by him. That case is firmly relied on as authority; but while the language employed in the opinion may have been misleading to counsel, the facts in the two cases are unlike, and the decision itself is not out of harmony with the doctrine we have stated, and

which has been declared in numerous other cases. A county-seat election was held in Howard county, with three candidates contesting, no one of whom received a majority of the votes cast. Only the two highest could be candidates at the second election, and at the canvass of the votes the board ignored a part of the returns and declared A and B to have received the highest number of votes, and to be the candidates to be voted for at the second election, while if a full canvass had been made it would have appeared that A and C were the two highest. The result of the canvass as made was accepted, and a second election was held between A and B, without any question as to the legality of the canvass, when A received the highest vote and was declared to be the permanent county seat. After the second election, an effort was made to obtain a recanvass of the first election. In giving judgment in that case, Mr. Justice BREWER expressed some doubt whether *mandamus* would lie to compel a correct canvass after the dissolution of the canvassing board, and whether, when the board has met at the legal time and place, made a canvass and adjourned, it can of its own will thereafter come together and make a second canvass. Without deciding the question suggested, he added:

"But whatever may be the rule as to the power of the court by direct proceeding to compel a recanvass after the dissolution of the canvassing board, it seems to us that any proceedings to compel such recanvass as to the *first* election should be had before the *second*. In other words, parties cannot accept the canvass of the first election as correct, enter into the contests of the second upon the basis of such prior canvass, and then, when disappointed in the result of the second election, obtain a recanvass of the first, or contest the result of the second on the ground of an incorrect canvass of the first."

This holding was based in part upon the provisions of chapter 126 of the Laws of 1872, where it is provided "that in no case shall the validity of any election be inquired into beyond the one last had and upon which the proceeding is based." In the present case only one election had been held, and the canvass of that had never been accepted and made

the basis of a second election; and hence the argument and decision in that case do not apply here. In that case, lest a wrong inference might be drawn from the language used, Mr. Justice VALENTINE, in a concurring opinion, stated that there was no doubt of the power of any proper court to compel a board of canvassers to recanvass the election returns where the board has in the first instance neglected or refused to canvass the same or any part thereof. And this although a particular day is fixed by law for the canvass, and the board has met on that day and canvassed a portion of the returns and adjourned.

In *Lewis v. Comm'rs of Marshall Co.*, 16 Kas. 102, the precise question involved here was presented, and the court determined that a canvass of part of the returns, a declaration of the result, and an adjournment *sine die*, is to be treated as a non-performance of the duty, and that the board may be compelled thereafter to reassemble and make the canvass as the law requires. Mr. Justice BREWER wrote the opinion in that case also, and after stating that the authorities were not uniform upon the question, remarked that —

" It is the duty of the canvassers to canvass all the returns, and they as truly fail to discharge this duty by canvassing only a part, and refusing to canvass the others, as by refusing to canvass any. And it is settled by abundant authority, that where the board refuses to canvass any of the votes it may be compelled so to do by *mandamus*, and this though the board has adjourned *sine die*. *Hagerty v. Arnold*, 13 Kas. 367, is a case in point. The canvass is a ministerial act, and part performance is no more a discharge of the duty enjoined than no performance. And a candidate has as much right to insist upon a canvass of all the returns as he has of any part, and may be prejudiced as much by a partial as by a total failure."

This doctrine has been repeatedly held and applied in other cases. (*The State, ex rel., v. Comm'rs of Hodgeman Co.*, 23 Kas. 264; *Brown v. Comm'rs of Rush Co.*, 38 id. 436; *Patten v. Florence*, 38 id. 501.) If the board may be compelled to reassemble and canvass the returns of the election, it would

seem that it might voluntarily do so. *Mandamus* is employed to enforce the performance of a duty, and since it is a duty, it certainly may be performed by the officers without the command or compulsion of the court. It is held **1. County-seat election—duty of new board to complete canvass.** that *mandamus* will not lie to compel an officer to do an act which without its command it would not have been lawful for him to do; and hence the county commissioners of Kearny county were authorized to proceed without the compelling force of a writ from the court. (*Johnson v. Lucas*, 11 Humph. 306; *The State v. Judge*, 15 Ala. 740; Hawes, Jur. of Courts, § 141.)

One of the reasons given by the new board for recanvassing the returns of the election was that a *mandamus* had been issued to compel the canvass; but these writs it seems had been set aside, although the orders vacating the same had not been entered of record in Kearny county. This was not the only reason, however, which prompted them to recanvass the returns, as it was well known that the old board had only made a partial canvass, and the members of the new board gave this fact as an additional reason for their action in making a recanvass. About the only objection made against that canvass is that the original returns from Kearny township, which had been deposited with the county clerk, were not used. When the new board came into office these returns were not on file, and the duplicate returns of the election retained in the township were sent for, and upon these the canvass was made. This duplicate was not in the hands of the township trustee or township clerk, for the reason that there were no such officers in the township at that time, but was kept in the possession of one of the judges of the election, who delivered it to the board. The original returns had been taken from the records of the county clerk's office by Waterman, the ex-county clerk, who was a friend of Lakin, to be used as evidence on one of the proceedings had before the district judge, and instead of returning them to the county clerk's office he took them to his residence, where they were left until he sold his house, and for some reason the returns were not thereafter

found. There is nothing in the testimony from which we can attribute the loss of the original returns to the friends of Hartland, or any of the candidates in opposition to Lakin.

**2. Original returns, lost—duplicate returns, used.** The duplicate returns were fully indentified, and we are satisfied that they were safely preserved and the genuine and true returns of the election, and hence were properly used by the board in making the canvass. The result of this canvass was the basis of the call for a second election, made on January 14, 1889, and it is now insisted that the sheriff could not legally call an election at the time he did, because of an injunction which had been procured to prevent such a call. As has been stated, an action was brought by the county attorney against Thorne, the sheriff, to perpetually enjoin him and his successors in office from calling another election for the permanent location of the county seat. In the absence of the district judge, application was made to the probate judge of Kearny county for a temporary order of injunction, and it was allowed by him, to take effect, however, on the execution of a bond in the sum of $200. No service of this order was made, and the summons was not indorsed "injunction allowed," nor was the injunction bond ever given. In the absence of a bond,

**4. Injunction—no bond given—void order.** the injunction order which was issued was inoperative and void, and was properly ignored by the sheriff. (Civil Code, § 242; *The State, ex rel., v. Comm'rs of Rush Co.,* 35 Kas. 150.) After the canvass had been made, and it was ascertained that no place had received a majority of the votes cast, it was clearly the duty of the

**3. Sheriff—duty to call second election.** sheriff to at once issue his proclamation calling a second election. Authority for his action is found in § 8, chapter 128 of the Laws of 1887, which provides "that in case no place shall receive a majority of the votes cast, the sheriff shall at once issue his proclamation for another election for the permanent location of the county seat."

Having reached the conclusion that the election of February 19, 1889, was properly called, we have disposed of the most important question presented in the case. The result of that

election as canvassed is that Hartland received a

**5. Hartland chosen as county seat.**

majority of 66 votes, and from all the testimony we think that place was fairly chosen as permanent county seat. The returns from the townships of Hartland and Kendall only are attacked. The most serious objection raised against the election at Hartland was the exclusion of a representative of Lakin from the polling-room for a short time on the morning of election day. The refusal was a qualified one, it being proposed that a representative would be admitted as soon as a Hartland representative was admitted into the polling-room in Lakin, and that in the meantime a representative of Lakin might stand at the window, in plain view of the ballot-box, and take the names of voters as ballots were cast, and that when a telegram was received from Lakin stating that a Hartland representative had been admitted there, the Lakin representative would be admitted at Hartland. This was agreed to, and the agreement was faithfully carried out. The reason given for this action was that at the former election the people of Lakin, in violation of an agreement, had denied admission to a Hartland representative to the polling-room, while Hartland had honestly carried out the agreement by admitting the Lakin representative, and the denial in the present case was retaliatory and to compel the Lakin people to admit a Hartland representative. While the friends of Hartland may have thought that this was the only means of compelling the Lakin board to allow a Hartland representative in the polling-room at Lakin, it was not justifiable. The exclusion of the representative of an opposing candidate from the polling-room is generally to be regarded as evidence of a fraudulent purpose on the part of the board, but it is not conclusive evidence, and is always subject to explanation. (*Gilleland v. Schuyler*, 9 Kas. 569; *The State, ex rel., v. Malo*, ante, pp. 54, 120; 22 Pac. Rep. 351.) In the present case the board was fairly organized, ballots were received at a large open window, the ballot-box was in front of the window, and the Lakin representative was permitted to stand at the window, where he

could see the reception of the votes, the conduct of the election board, and keep a list of the voters as they presented their ballots. In pursuance of the agreement, a messenger was sent to Lakin, who telegraphed back that a Hartland man had been admitted to the polling-room at Lakin, and at that time, which was about an hour and a half after the polls were opened, the Lakin man was admitted at Hartland. There is considerable testimony with reference to the organization and conduct of the board, and from it all we are inclined to believe that the exclusion of the representative was for the purpose stated, and that there was no dishonest motive or any purpose to corrupt the poll.

It is further claimed that 42 votes were added to the poll-book, and that 42 illegal ballots were put in the box at Hartland, but the proof does not establish the claim. The witness Perry, who undertook to keep a list of voters, says that when he left the window and went into the polling-room he found that the poll-book contained a large number of names which did not appear on the list which he was keeping, and that soon after coming into the room his book was lost or stolen, and that at once he procured another book and copied from the poll-book the names there entered. He says there were 56 names when the book was lost, and 101 on the poll-books when he finished copying the names. The plaintiff contends that the loss of the book and the charge of theft against the people of Hartland was a prearranged plan on the part of the representatives of Lakin, and an attempt to cast a shadow on the returns of that precinct. There are several things which tend to discredit the claim made by Perry: In the first place, the list or book was not kept by Perry alone, but the names had been taken down by several persons, some of whom were not witnesses. Perry, who represented the opposition, says that he discovered the extra names when the copy was made, but said nothing about it; did not check the names or in any way indicate the ones which he thought were wrongfully added to the poll-book. These so-called fictitious names were written down by him without protest or any marks

by which they could be identified in the future. After copying the names on his book and verifying them by comparison with the poll-books, he claims to have kept a complete list of all subsequent voters, but when called on for the list or book he only produced a part of it; all that part in which the first 139 names were recorded was gone. He states that the names on the poll-book after and including number 89 were genuine, and that the fictitious 42 preceded that number, and hence the list of these was absent. This portion of the book Perry admits that he destroyed, using the leaves from time to time for waste paper. The names contained in the remnant which was produced did not appear in the order that they were written in the poll-book, indicating that the list was carelessly kept. It is strange indeed that if Perry really suspected that a fraud was committed that no objection or protest should be made, and also strange that the evidence by which the fictitious names might be identified was thought of so little value that it should not be preserved. According to his statement the fictitious votes occurred between the 44th and the 101st names recorded on the poll-books, but the testimony shows that these are the names of some of the most prominent and best-known people of that township. Aside from that, several witnesses well acquainted with the voters of the township identify all the voters, and other testimony introduced shows that no names were written upon the poll-books except of persons who appeared at the window and presented their ballots, and that no ballots were put in the box except those presented by legal voters for that purpose. To sustain the claim that illegal votes were cast at Hartland, evidence was offered that a number of persons who voted there had previously voted at an election in Grant county. This is accounted for by the fact that they were residents of Appomattox, a candidate for county seat in Grant county, and that town, having been defeated, was nearly depopulated, and its residents moved to other places, a number of whom settled at Hartland. If these voters removed to Hartland with the *bona fide* purpose of permanently locating there, and had

been located there thirty days or more prior to the election, they were entitled to vote there at that time. A great deal of proof is taken with reference to the purpose of these voters, and it fails to convince us that they were not legal voters of Kearny county at the time of the election. Only four of the number ever returned to Grant county, and these swore that they went to Hartland in good faith, expecting to make it their home, and located there with their families.

It is finally urged that there was corruption in the election in Kendall, which should destroy the poll. There is testimony that a number of persons in that township organized for the alleged purpose of controlling the election. Some of the members who were witnesses state that their purpose was to ascertain the place which had the greatest number of votes, and then to throw the votes of the organization in favor of that place, and in that way end the county-seat controversy. There is testimony indicating that some of the officers and members expected to use the organization to obtain money from one of the candidates; but whatever their purpose was, it is apparent that they failed to carry it out, and, as one witness said, the organization broke up and each member voted as he pleased. The officers and leaders of the organization did not vote for Hartland, but cast their votes for Chantilly. They further claim, however, that more votes were cast for Chantilly and Lakin than were actually returned. The returns from that precinct show that 67 votes were cast for Hartland, 11 for Chantilly, and one for Lakin. Thirteen persons went upon the witness-stand and testified that they voted for Chantilly; and they claim that there were still others who had voted for Chantilly; and further, that two persons voted for Lakin, while only one vote was returned. The testimony of Moses Miller, one of the thirteen who it is claimed voted for Chantilly, is not very satisfactory. When he gave his testimony he was in doubt as to the name of the place for which he voted. He was a native of Virginia, and was a slave up to the time of the emancipation proclamation, who said he cast his first vote for Abraham Lincoln for presi-

dent, and voted for Johnson when he was a candidate for the United States senate from Tennessee. In regard to voting, he speaks of signing a paper in favor of Chantilly. He was unable to read, and when asked how he knew he had voted for Chantilly, answered because a man gave him the ticket and that they voted together, and he said he voted for Chantilly. The man who gave him the ticket was not produced as a witness. Another of the thirteen was a German, who is unable to read English, who first said he voted for Omaha, and afterward stated that he voted for Chantilly. When shown the printed word "Hartland," he inquired, "Ain't that 'Chantilly'?" Another of the thirteen who swears that he voted for Chantilly at that election, states that he did not see what name was on the ticket for county seat; that the ticket was given to him by another; and further, he admitted on cross-examination that he sold his vote to Lakin for $10 at the July election. Murphy, who testified that he voted for Chantilly, admits that he had sold his vote on the question of county seat at two different times prior to this election.

Other testimony which would weaken the force of the defendants' claim might be mentioned, but this is sufficient. They have failed to impeach the conduct of the election board or to destroy the *prima facie* character of the returns. The election board was openly and fairly chosen, and we are not convinced that it acted dishonestly in the performance of its duties. Even if it was granted that the individual votes, the validity of which is challenged, should be thrown out, it would not change the result of the election, as they would not nearly equal the declared majority of 66 votes in favor of Hartland.

There is a good deal of incompetent testimony included in the report of the commissioners, such as the general rumor about the honesty of the several county-seat elections held in Kearny county, and other hearsay testimony, as well as *ex parte* affidavits, which have not been referred to in this opinion and should not have been brought into the record. An examination of that which is admissible leads us to the opinion

48—42 KAS.

that the election of February 19, 1889, resulted in favor of Hartland, and that it must be adjudged to be the county seat of Kearny county.

All the Justices concurring.