The petition is as follows : —
The undersigned petitioners, citizens of the city of Boston, respectfully represent that they were candidates in the 17th Suffolk District for members of said House of Representatives for the *60 year 1894, and that if all the votes had been counted for them that were legally cast for them at the election on Nov. 7, 1893, and only the votes counted that were legally cast for their opponents-, James H. Doyle and Richard J. Hayes, your petitioners would have been declared elected and would have received the certificates therefor. Your petitioners are informed and believe that many votes cast at said election for the said James H. Doyle and Richard J. Hayes were irregular and fraudulent, that persons’ names were on the check list and voted upon at said election who had not arrived at 21 years of age, and that said parties were illegally registered in the interests of the said J ames H. Doyle and Richard J. Hayes ; and that the said James H. Doyle and Richard J. Hayes solicited and induced persons under the age of 21 years to so illegally register and vote, knowing them to be under 21 years of age. Your petitioners are informed and believe that “ repeaters ” voted in said ward upon names not their own, and that it was systematically done, in the interests of the said James H. Doyle and Richard J. Hayes. Your petitioners are informed and believe that persons were registered as living in said ward and voted there at said election who did not live in said ward and had no right to vote there, and that the- said James H. Doyle and Richard J. Hayes solicited people to so illegally and fraudulently register and vote. Your petitioners are informed and believe that sections 165, 229 and 334 of the election act of 1893 were wilfully violated at said election, and that the said offences were committed in the interests of the said James H. Doyle and Richard J. Hayes. Your petitioners are informed and believe that persons were assessed as living in said ward on May 1, 1893, who did not live there, and that said persons were thus fraudulently assessed in the interests of the said James H. Doyle and Richard J. Hayes. Your petitioners further represent that ballots cast at said election were tampered with and mutilated after they had been cast by the voter, and that the same was done in the interests of the said James H. Doyle and' Richard J. Hayes. And that said acts and various other acts of fraud and illegality were perpetrated by the said James H. Doyle and Richard J. Hayes, and by various parties in the interest of the said James H. Doyle and Richard J. Hayes, in order to illegally and fraudulently promote and influence the election of the said James H. Doyle and Richard J. Hayes.
Wherefore your petitioners pray that your honorable body will declare that your petitioners are duly and legally elected to and that they be given the seats in your honorable body now held by the said James H. Doyle and Richard J. Hayes, or such relief be given them as justice may require.
*61 After prolonged hearings and the examination of numerous witnesses, the questions involved were argued in behalf of the petitioners by Messrs. Champlin and Johnson, and in behalf of the sitting members by Mr. Russell.
Counsel for petitioners submitted the following requests for rulings, and citation of authorities in support thereof : —
I.
First Ruling. Where sufficient illegal votes are shown to change the result of an election, but it is not shown for whom they were cast, the best rule is in a legislative body having power to order a new election, and in any other tribunal having the same power, to order such new election.
The rule is different from that adopted by the courts of justice, where there is no power to order a new election.
McCrary, secs. 461, 462.
Duffey’s case in Brewster, 531.
II.
Second Ruling. Circumstantial evidence to show for whom a voter cast his vote is received in election contests.
Paine on Elections, sec. 768.
McCrary, sec. 456.
People v. Pease, 27 N. Y. 45.
Tomline v. Ryder, 44 Law Times, 187.
Note to Palmer v. Howe, Loring & Russell, p. 151.
Third Ruling. The safe rule probably is that when an election board are found to have wilfully and deliberately committed a fraud, even though it affects a number of voters too small to change the result, it is sufficient to destroy all confidence in their official acts to put the party.claiming anything under the election conducted by them to the proof of his votes by evidence other’ than the returns.
Where a return is clearly shown to be wilfully and corruptly false in any material part, the whole of it becomes worthless as proof; for if false and corrupt in one part, it may be in others, and all faith in its reliability is destroyed.
McCrary, secs. 541, 542, 543.
Judkins v. Hill, 50 N. H. 140.
Mann v. Cassidy, 1 Brewster, 50.
Blair v. Barrett, 1 Bartlett, 308.
*62 Where the result in any precinct has been shown to be so tainted that the truth cannot be deducible therefrom, then it should never be permitted to form a part of the canvass. The precedents as well as the evident requirements of truth not only sanction but call for the rejection of the entire vote when stamped with the characteristics so shown.
Howard v. Cooper, 1 Bartlett, 275.
Where the judges of the election receive and change a number of illegal votes and cause fictitious names to be placed on the poll books and put spurious ballots in the ballot boxes, the returns from that precinct shall be rejected.
Blue v. Peter, 40 Kan. 261.
Ohio House Journal, 1886, p. 38.
III.
Fourth Muling. Under the common law, bribery and corruption disqualify a person from a seat in the legislative assembly.
Corruption is defined by Bouvier’s Law Dictionary to be an act done against law. “ It includes bribery, but is more comprehensive, because the act may be corruptly done though the advantage to be derived from it be not offered by another.”
Merlin Rep., copy by Bouvier.
Corruption is defined as purposely doing an act which the law forbids.
Cooper v. Slade, Ell. & Pl. 161 (English).
It is a crime in common law to commit any offence against the purity and fairness of the public election.
Paine on Election Laws, sec. 496.
IV.
Fifth Muling. A contested election case, whatever the form of the proceedings may be, is in its essence a proceeding in which the people, the constituents, are primarily interested.
Mann v. Cassidy, 1 Brewster, 45.
People v. Holden, 28 California, 109.
Collins case, Brightly, 513.
Counsel for sitting members submitted the following requests for rulings, and citation of authorities in support thereof : —
*63 I.
First Ruling. While under the Constitution the House is the sole “ judge of the returns, elections and qualifications of its members,” in deciding them it should act according to the rules of law, as the question is one of vested legal and property right.
Authorities. While the House has absolute power over the subject, “ it may be proper to add that the House of Representatives has been accustomed in such cases to follow the rules of law.”
Attorney-General Pillsbury’s answer to House, ante, p. 49.
“ The same general rules by which courts of law are governed in regard to the evidence in proceedings before them prevail also in the investigation of cases of controverted elections.”
Cushing, Law and Practice of Legislative Assemblies, sec. 210.
That the committee are to act judicially, like the court in a quo warranto proceeding,
See Brightly’s Election Cases, p. 466.
The right to public office after election or appointment is a legal right, and the title to it must be tried and determined according to law.
Meechem, Public Office, sec. 1.
2 Blackstone, Com. 36.
Troop, Public Officers, secs. 16-18.
II.
Second Ruling. Under the order of reference by the House, the committee can consider and report upon only the allegations in the petition and the specifications thereunder.
Authorities. “A committee is not at liberty to entertain any proposition or go into any inquiry which does not come within the direct purposes for which the committee is appointed, as expressed or clearly implied in the authority conferred upon it, or which is not grounded upon some paper which is referred to the consideration of the committee.”
Cushing, Law and Practice, sec. 1906.
III.
Third Ruling. The petitioners, in order to unseat the sitting members, have the burden of proof to establish two facts : 1st, that *64 illegal votes were cast at the election; and, 2d, that enough of such votes to change the result were cast for the sitting members.
Authorities. This proposition was clearly established by the Supreme Judicial Court of Massachusetts.
1. “ It is no objection to an election that illegal votes were received, unless the illegal votes changed the majority. The mere fact of their existence never avoids an election. This is so plain a proposition that it needs no authority to support it. It is the principle adopted and acted upon in all cases of contested elections, whether in the British Parliament, the Congress of the United .States, the legislature of this or any other of the United States. The burden of proof too is always upon the persons contesting the election.” (Morton, J.)
First Parish v. Stearns, 21 Pick. 148, 154; and see
Trustees of School v. Gibbs, 2 Cush. 39.
Wardens of Christ Church v. Pope, 8 Gray, 140.
2.The text writers are to the same effect.
Judge Cooley says : “ The admission of illegal votes at an election will not necessarily defeat it, but to warrant its being set aside on that ground, it should appear that the result would have been different, had they been excluded.”
Cooley, Constitutional Limitations (6th ed.), p. 780.
Judge McCrary says : “ It is not a valid objection to an election that illegal votes were received, if they did not change the majority.”
McCrary, Elections, sec. 444.
Meechem says: “ Whoever contests the validity of an election upon the ground of irregularities, and the manner of calling or conducting it, or of the reception of illegal or unauthorized votes, must be prepared to show that the irregularities were of such a nature, or the illegal votes were of such a number, as to materially affect or alter the result.”
Meechem, Public Office, sec. 224; and see
Brightly, Election Cases, p. 238.
Cushing, Law and Practice, sec. 198.
Paine, Elections, sec. 510.
3.The House of Representatives has always recognized and enforced this rule.
*65 In the Charlemont case in 1830, it held that the mere fact of the reception of an illegal vote 'would not invalidate the election.
Charlemont, Cushing, S. & J. El. Cases, 261.
“The reception of illegal votes not sufficient in number to affect the majority 'will not invalidate an election.”
Marblehead, Id., p. 285.
“The reception of illegal votes sufficient in number to change or prevent a majority is not sufficient to invalidate an election, unless it also appears that such votes were for the person elected.”
Ashfield, Id., p. 583.
The committee in 1876 (A. E. Pillsbury, Chairman) adopted these rules: —
“That the official returns are prima facie correct, and the burden of proof is upon the petitioners to show the alleged frauds or mistake.”
“ That the returns cannot be set aside, or the declared result of the election avoided, by proof that votes were cast by persons not entitled to vote, unless the ward officers, in receiving such votes, acted dishonestly or collusively, or unless it is proved that such votes were east for the sitting members, and the rejection of them would have changed the declared result.”
Barr, Pet., Loring & Russell, El. Cases, 255.
In the most recent case — in 1886— where votes were received of persons registered illegally without personal application, the House overruled the committee and unanimously voted: —
“ Whereas, it does not appear from the committee’s report that the votes illegally registered would have changed the declared result; therefore, voted, that the petitioner have leave to withdraw.”
Mansfield v. Hutchins, ante, p. 3.
IY.
Fourth Riding. Under our present system of voting (the Australian Ballot Act) no outside evidence is admissible to show for whom an unchallenged voter cast his vote.
*66 Y.
Fifth Ruling. Where an unchallenged voter declines to state for whom he voted, extrinsic evidence of declarations, party affiliations, or personal relation to candidates, is entitled to little, if any, weight, as bearing upon the question for whom such voter voted for representative.
Authorities. This committee held in 1815 that “ the declaration of a voter whose right to vote comes in question, made after the election, and when not under oath, that he voted for a particular individual, was held not to be sufficient evidence for whom he voted on an inquiry into the validity of the election.”
Dresden, Cushing, S. & J. 201.
In Palmer v. Howe (Loring & Russell, El. Cases, p. 145) evidence was admitted of the political associations and reputation of voters; but the minority of the committee held that this was insufficient evidence to unseat the member, and the House substituted the minority report, and confirmed the title of the returned member to his seat.
See Editorial Note, Loring & Russell, El. Cases, 149-151.
In a congressional case, Cessna v. Myers (Smith, Cong. Election Cases, 60), Mr. George F. Hoar, the chairman, reported: “ Another question of importance which has arisen in the discussion of the cause is the question whether evidence of the declarations of alleged voters made not under oath in the country should be received to show the fact that they voted, or for whom, or that they were not legally entitled to vote. Some of the committee think that such evidence ought in no case to be admitted, except, of course, so far as declarations made at the time of the party’s intent or understanding as to his then present residence or his purpose in a removal is admissible as part of the res gestee. All of the committee are of opinion that such evidence is to be received with the greatest caution, to be resorted to only when no better is to be had, and only acted on when the declarations are clearly proved and are themselves clear and satisfactory.”
Says Judge McCrary: “ It cannot be denied that the tendency in the most recent and we think also the better considered cases is to exclude this evidence as hearsay.”
McCrary, Elections, sec. 270.
State v. Ohio, 23 Wis. 319.
Gilliland v. Schuyler, 9 Kan. 569.
*67 Says Judge Cooley: “ A very loose system prevails in the contests over legislative elections, and it has been held that when a voter refuses to disclose for whom he voted, evidence is admissible of the general reputation of the political character of the voter, and as to the party to which he belonged at the time of the election. This is assuming that the voter adheres strictly to party and always votes the ‘ straight ticket,’ — an assumption which may not be a very violent one in the majority of cases, but which is scarcely creditable to the manly independence and self-reliance of any free people ; and however strongly disposed legislative bodies may be to act upon it, we are not prepared to see any such rule of evidence adopted by the courts.”
Cooley, Constitutional Limitations, p. 763.
People v. Cicott, 16 Mich. 283.
The committee reported as follows (Mr. Bailey dissenting) : —
The Committee on Elections, to whom was referred the petition of Harry O. Alexander and Isaac P. Hutchinson, “ That they may be declared to be the duly elected members of the House of Representatives from the 17th Suffolk District,” beg leave to report as follows: —
The above petition was received Jan. 16, 1894, and referred to this committee on January 17, and the committee began its sessions upon the 25th of January, which sessions have been held almost daily up to the present time.
The 17th Suffolk District is composed of Ward 17 of the city of Boston. According to the official returns, on recount, the vote for representative was as follows: Alexander, 1,119; Doyle, 1,231; Hayes, 1,209; Hutchinson, 1,133; Pickering, 91.
It was also in evidence that Quinn received about 100 votes.
The petitioners alleged illegal votes cast for the sitting members, James H. Doyle and Richard J. Hayes, which, if not counted, would have been sufficient to change the result.
There was no allegation that Messrs. Doyle and Hayes were ineligible by reason of non-residence. The petition is here referred to and made part of this report.
It was agreed by counsel that the fraud of ballot mutilation was confined to the fifth precinct; and your committee, after examining with counsel the ballots of that precinct, and receiving evidence from the precinct officers relative thereto, undertook a recount of the ballots cast in the fifth precinct with reference to the vote for representatives.
*68 They found a net gain for all the candidates. Alexander gained 21 ; Doyle, 2; Hutchinson, 18, — giving Doyle a plurality over Alexander of 92 ; Hayes a plurality over Alexander of 71; Doyle a plurality over Hutchinson of 81; and Hayes a plurality over Hutchinson of 60, — in the ward, the committee having eliminate^ the fraud of ballot mutilation in the fifth precinct.
The powers of the House and of this committee are conferred by the tenth article of section 3 of chapter I. of the Constitution of Massachusetts, which provides that the “ House of Representatives shall be the judge of the returns, elections and qualification of its own members, as pointed out in the Constitution.”
On the corrected count it became necessary, therefore, for the petitioners to show, aside from the mutilated votes, from 92 to 60 illegal votes cast for the sitting members respectively, in order to tie the result. The least number of said illegal votes necessary for the petitioner Hutchinson to prevail over Hayes would be 61; over Doyle, 82 ; the least number of said illegal votes necessary for petitioner Alexander to prevail over Hayes would be 72 ; over Doyle, 93, — after correcting the count in the fifth precinct.
The committee voted to receive evidence tending to show how proven illegal votes had been cast; evidence of the declarations, associations and affiliations of illegal voters, and raising, with respect to this evidence, a question of its weight rather than of its admissibility.
The committee, sitting as jurors upon a question of fact, have been compelled to regard considerable of the evidence offered as of dubious credibility, even where that evidence was relevant to the issue.
The committee desired first to ascertain, as far as possible, what were the facts, and did not follow, in their investigation (so far as the admission of testimony was concerned) the strictest technical rule. This greatly widened the scope of their investigation, and, not unnaturally, prolonged, to an unprecedented extent, the consideration of the case, nearly 350 summonses to witnesses having been issued.
The committee would be derelict in its duty if it failed to notice, formally, what has been conclusively proven in the course of its investigations.
It finds that the sitting members have been guilty of issuing, in the course of their campaign, a circular misrepresenting the petitioner Hutchinson, as to his record upon certain public questions, as a member of a previous Legislature, — a statement proven to be false, upon a matter vitally affecting the campaign, —■ an act which admits neither palliation nor excuse.
*69 The committee finds evidence of a systematic attempt to register minors, and that minors voted in the election without the shadow of a right; they find instances of personation of voters who were either absent from the city or who were denied the right to vote because that prerogative had been exercised for them before they claimed it. "We find personation of those who could not vote because of prior engagements in penal institutions of the Commonwealth.
Upon the question of residence there is necessarily a greater doubt than upon the questions of minority and personation.
The rear of No. 492 Harrison Avenue is included within the 17th Suffolk District. It is an arched way leading from Harrison Avenue to a yard, in which are a number of sheds, stables and one dwelling-house. In 1891 there were registered from the rear of No. 492 Harrison Avenue two persons; in 1898, 23 persons, most of whom voted in the election upon Nov. 7, 1893. With the exception of two persons registered from the dwelling-house, and one person who occupied, a part of the time, an engine-room, all the others registering from that number lived or claimed residence in the stables.
It was in evidence, and the evidence was uncontroverted, that there was no bed, bedding or other evidences of the use of the stables by human beings for sleeping purposes ; that few, if any, of those claiming residence there had, at that place, any personal effects or wearing apparel other than what they wore.
The committee made a personal inspection of the premises and found them wholly unfit for human tenancy. While subject to the requirements of the health authorities, under the policy of a widely extended suffrage which permits, with few regulations or limitations, a man to claim a legal residence where he chooses, it is certainly a question going to the good faith of his claim when not the slightest evidence of his domicile, beyond his casual and occasional occupancy, is shown. It, therefore, becomes a serious question as to how many of those claiming residence in the stables at the rear of No. 492 Harrison Avenue were entitled to vote. It is certain that a number of those so claiming had no such right, and that, therefore, their votes in the State election were illegal.
The charges were that 15 persons could not read or write (this charge, in several instances, the committee think has been proved) ; that 15 were minors (this charge the committee think has been proved in several instances) ; that 40 were non-residents ; that 35 voted on names not their own ; that 10 were not citizens ; that 5 registered by other parties. These allegations were all sustained, except as to the number in each ease.
*70 Some of the witnesses who were shown to be illegal voters testified that they voted for the petitioners. It will be seen that the difficulties of proving a number of illegal votes cast for the sitting members were not lessened by this testimony.
But the grossest fraud in this case consists in the acts or negligence of the election officers of Precinct 5 in the mutilation of ballots with respect to representatives. Thirty-seven of those ballots were so mutilated, — marked in the compartment designated for representatives with extra marks, tending to render void the expression of the voter in that one respect, — and while most of those ballots were marked in other respects for Republican candidates, some of them were for Democratic candidates. This is the grossest outrage that could be committed upon the elective franchise, — that those who were charged with the duty of protecting the purity of the ballot should be the ones to attack it, in violation of a most sacred trust! The committee recommend that the attention of the district attorney for the Suffolk District be called to the eases of the election officers of the fifth precinct, and generally to the frauds herein enumerated. The committee find evidences of a concerted action to corrupt the election in Ward 17.
Illegal voters are not a spontaneous product. They are the result of careful cultivation. While your committee cannot place, beyond a reasonable doubt, the guilt, it is entirely evident that there was a concerted action to register minors and to have them vote ; to secure votes of non-residents, and of those who were not citizens. They do not find that the increase in registration from 1891 to 1892 is, of itself, evidence of this, — 1892 being a Presidential year, and the increase in Ward 17 was only slightly greater than that on an average throughout the city; while in the same ward from 1887 to 1888, the preceding Presidential year, there was a slightly greater increase, with a different assessor.
The conclusion which your committee draws upon that point is that of a greater political activity in registering for a Presidential year.
Under the rules recognized by tribunals, it is not only necessary to prove fraudulent votes, but to also show for whom they were cast. Where the parties are willing to testify and state the fact, the determination is, of course, an easy matter; but where the voter declines to testify, the determination of this point is extremely difficult.
Following the authorities, the committee permitted a wide range of evidence, including statements, admissions, affiliations and relationship of voters. This testimony must, of course, be scrutinized with much circumspection, not only by reason of its nature, but *71 by reason of the further fact of the growing independence on the part of voters. It was in evidence in this case that there were two independent candidates.
While the petitioners have offered evidence of gross and varied fraud, the committee do not feel that the petitioners have maintained the burden of showing a sufficient number of illegal votes cast for the sitting members to change the result; and therefore recommend that the petitioners be given leave to withdraw.
Mr. Bliss made a further report for the committee upon the requests for rulings submitted by counsel as follows: —
At the close of the hearing the committee were asked by counsel for the respective parties to make several rulings on propositions of law and evidence, which are given above.
These propositions were argued at length and with great ability by counsel. As these requests contain sundry pertinent propositions of law, we copy them in full.
Upon our finding of fact it became unnecessary to pass upon all the requests of the counsel for the seated members. Referring, however, to them generally, the committee say they endeavored to follow the usual rule governing other tribunals in analogous proceedings, giving as to the admissibility of evidence a somewhat wider range than is allowed in court. These rules do not prevent those charged with judging from concluding one fact from another, or from drawing a reasonable conclusion from a congery of incidents. On the other hand, they certainly do not warrant the inference of a fact from a conjecture. A relaxation of these rules would put every minority party to a dependence, not on its rights, in a trial which proceeded from evidence to facts and from facts to judgment, but on the mercy of a dominant party, influenced by the same dangerous zeal for domination that induced the first fraud.
Of the requests for rulings made by counsel for the petitioners, the first became immaterial in view of the finding of facts. The second request is predicated on facts and conditions different from those existing in this case. The request cites McCrary, American Law Elections, secs. 441-443, the text of which is as follows: “ Fraud in the conduct of an election may be committed by one or more officers thereof, or by other persons. If committed by persons not officers it may be either with or without the knowledge or connivance of such officers. There is a difference between a fraud committed by officers, or with their knowledge and connivance, and a fraud committed by other persons in this : the former is ordinarily fatal to the return, where the latter is not fatal unless it appears that it has changed or rendered doubtful the result. If *72 an officer of the election is detected in a wilful and deliberate fraud upon the ballot box, the better opinion is that this will destroy the integrity of his official acts, even though the fraud discovered is not of itself sufficient to affect the result.” The reason of this rule, as given by the author, is “that an officer who betrays his trust in one instance is capable of the infamy of defrauding the electors, and his certificate is therefore good for nothing.” Were we not able to define and fix the limit of the fraud attributable to the election officers, and were we not able to disconnect the fraud from the proceedings, and then purge the proceedings thereof so far as it related to any alteration of ballots, the situation would be different.
The ballots cast in Ward 17 were all brought before us, and we proceeded to count those in question. The number cast was recorded by a machine, and there is no dispute as to the accuracy of it. There was no charge of fraud and no evidence of fraud in the manipulation of the ballots, except in the matter of marking as above described. The case, therefore, does not seem to come within the rule cited in Howard v. Cooper, 1 Bartlett, where the result is supposed to be “so tainted with fraud that the truth cannot be deducible therefrom.” The untruth involved in the spurious third marks on the ballots before us was corrected, and the votes were counted as though no mutilation was made. This left the case before the committee dependent upon the allegation of fraud in false impersonation, and false registration, or registration of persons not qualified to vote, with the charge of complicity on the part of the seated members. After carefully and laboriously considering all the testimony, we came to the conclusion stated in the body of the report.
An investigation of this character by a legislative committee involves more than the property rights of a person to an office having emoluments ; it involves beyond this the right of a people to a representation in the legislative branch of the government, and the right of the Commonwealth to a voice from every district in its deliberations for the whole people. Fraud connected with an election should be punished, and the law is ample to that end. But in this tri-party combination we have no right to punish the fraud of an individual voter or the fraud of a combination of voters by depriving the rest of the people of their representation -in the General Court, or by depriving the State of its voice from that people, or even by depriving the representative-elect of his office, unless, the fraud being eliminated, the result is changed, or unless the fraud is so involved in the election that it cannot be defined and subtracted, or, as to the person claiming to be elected, unless, *73 perhaps, he has become personally so involved in the fraud that in the elimination of it he is carried along under a judgment of disqualification.
Rules must he made in view of possible and probable cases that will follow. The rule should not be made so broad that it may be used as a means of perpetrating a fraud in another case. If the rule were established that a fraud attributable to an election officer should avoid an election, although it is possible to eliminate it from the result, and although it would not change the result, then had the seated members been defeated in the last election, and Alexander and Hutchinson elected, the independent candidate Quinn could have called for and obtained a new election, unseating Alexander and Hutchinson on the very evidence upon which these parties are now contending; and a candidate at the close of election day, finding himself clearly defeated in numbers, could procure some of his friends to mutilate the ballots as they cast them, making, for instance, the third mark with a different pencil, and thereafter demand that the election be set aside because of the alleged fraud, although the ballots counted in any possible way would not have changed the result.
The third request for ruling is substantially answered above. As to the fourth and fifth, we believe the counsel have substantially stated the law. We do not, however, find that there was such complicity proven in the application of the rules to the seated members as to warrant the committee in recommending that the members be unseated or that a new election be ordered.
As to the individual cases in two or three of the classes relied on by the petitioners, we make the following comments. There were twelve alleged cases where persons voted upon the names of others. The intelligence that some of these people brought to the service is illustrated in the testimony of a witness who said he went out to inquire of a man’s wife to know whether her husband had authorized any one else to vote on his name. It must be noticed that these frauds were committed in the presence of officers from each political party. Except in two or three instances there was no evidence whatever as to the person who cast the false ballot, and, of course, no evidence as to the candidate for whom it was cast. Whatever may be our political views, the committee, acting as judges, cannot find as a fact that these false votes were all cast for the seated members.
There were twelve cases where it was alleged the voter could not read and write; namely, the case of Coleman, Broderick, McLaughlin, Crowley, McCabe, Henchon, Keefe, O’Melia, Madden, Dolahor, Toomey and Kelliher. All but one of these were *74 voters of long standing. O’Melia was registered in 1876. Coleman said he voted for Butler. He further swore he had been injured in an accident which affected his eyesight so that he could not read. Toomey testified that he was naturalized and registered in 1871. McCabe testified that he was registered eleven years ago. He read imperfectly before the committee. The committee suggests that the signatures of these persons be also exhibited with the ballots. Patrick Madden was naturalized and registered in 1885. He had but one eye, and read imperfectly; says he wrote his own name when he was naturalized. Martin O’Melia testified that he was naturalized some twenty-seven years ago, and voted for Lincoln. Says he was not required to read and write. Broderick refused to try to read, saying he had been sick ; that he had voted every year for eighteen years. There was no evidence that he could not read and write. McLaughlin’s testimony is extremely uncertain. Henchon said he was naturalized eighteen years ago, and had voted in Ward 17 for eighteen years. He testified that his eyes had been injured when he was working in some glass works. John Dolahor testified that he was naturalized in 1862 or 1863 ; could read some, but his sight was poor. Had lived in Ward 17 twenty years, and voted soon after he was naturalized. He said he owned his own house. Patrick Kelliher was naturalized in 1876, and voted ever since. Said he could read when he was naturalized. He had been treated in the hospital for his eyes. Keefe testified that he had voted for seven years, and said he could read when he was registered. Coleman complained he had been broken up in an accident, and said he could read some time ago. Had voted two or three years. We will append an index reference to the testimony of these persons for the convenience of the House.
It was claimed that twelve minors voted; namely, Thomas Clagget, Humphrey McCarron, Thomas McQuinn, Michael Cur-ley, William T. Burns, Cornelius Sweeney, William Broderick, Edward Fitzgerald, Bernard McCabe, William E. Costello, William H. Mahoney, and Morris McCarthey. There was no evidence as to Thomas Clagget, except the record of the Rice School, which showed that a Thomas Clagget was admitted to that school in September, 1883. His age was given as eight years and five months, his father’s name Patrick, residing at 25 Fabian Street; making him in November, 1893, eighteen years and seven months. Clagget was summoned but did not appear. Humphrey McCar-ron testified that he voted for Hutchinson, Rep., and Quinn, Ind. According to the Rice School record his age in November, 1893, was nineteen years and seven months. Thomas McQuinn did not *75 vote, but was registered. Accoi’ding to the Rice School record his age in November, 1893, was twenty-one years and eleven months. Michael Curley testified he voted for Hutchinson and Hayes. Says he was born in June, 1872. The registry of births contains an entry, “Michael Curley, June, 1875,” making him eighteen years and eleven months in November, 1893. It was in evidence that this party attended the Rice School, and Lincoln Owen, one of the principals of the Rice Schodl, was examined as to the school record respecting the ages of scholars. No question was asked as to the school record respecting Curley. It was in evidence that the manner of obtaining the information upon which the school record was made up is, in case the pupil is transferred, to take a statement on the transfer card; if a parent comes in the first instance, to ask the parent, otherwise to ask the child. The next case was that of William T. Burns. This witness testified that he was born June 11, 1872 ; that his father’s name was William Burns, a stable worker, and his mother’s name was Mary Burns; that he was born on Albany Street. A record from the registry of births was put in showing “ William T. Burns, son of William T. and Joanna, born Albany Street July, 1873.” Observe in the record that the father has a middle initial and the mother’s name is given as Joanna. Cornelius J. Sweeney appeared and testified that he was born in Worcester, father’s name John, mother’s Jane, Sept. 12, 1872. Had attended the Rice School. To contradict the voter the record of the Rice School is put in, showing an entry, “Cornelius Sweeny, 13 years 11 months, father John, 478 Albany Street, admitted January, 1888.” If the record states the fact, the voter was less than twenty when he voted. Observe, however, that in none of these cases is there any personal identification. The city directory for 1893 contains fourteen John Sweeneys and four Cornelius Sweeneys. The next case was William Broderick. His father, John, testified his son was twenty-three last Washington’s birthday. Was born in Roxbury; mother’s name Kate. William testified he was born February 22, 1871; said he did not vote for either candidate for representative. Had attended the Rice School about six years ago ; came up from Franklin School. Against this voter is put in a portion of the school record, as follows : “ William Broderick, age at admission, ten years nine months; came from Dwight School; father John, 27 Hamburg Street; entered special class December 3rd, 1885, was discharged January 14th, 1885.” If the record is right Broderick was but twenty years and eight months of age in November, 1893. Observe that there was no personal identification. The city directory of 1893 shows six John Brod- *76 ericks and five 'William Brodericks. The next case was that of Edward Fitzgerald. He testified that he was born Nov. 2, 1872. Father Edward A., mother Ellen. The record of the Rice School disagrees with his testimony. This party swears he voted for Quinn and Hutchinson. Bernard McCabe is shown to have been under age. He testified in the case, and his reputation for truth and veracity was impeached by his uncle.
The next case was Eugene Sullivan, who admittedly was under age.
William Costello testified that he was twenty-three ; that he was born March 24, 1871, and voted two years ago; that his father’s name was John H., and his mother’s name Mary E. To contradict him the record of birth is put in as follows : “ William E. Costello, date birth March 21, 1872. William Edward Costello, male, born at Portland, Maine ; son John H. and Mary E., residence parents ; occupation of father, brewer; father born New York, mother Maine.” William E. testified he was born in Maine. The record does not seem to contradict the witness. There is no question but what he was old enough to vote in 1893. He testified that he was “ associated with the Democratic party.” William H. Mahoney testified that his father’s name was Michael, mother’s name Catherine, born Boston, Dec. 17, 1871, on Oneida Street. Had attended the Rice School; left Rice School about 1885. The record of births is put in as follows : “ William H. Mahoney, date of birth, September 28th, 1874; William H. Mahoney, born 259 East Eighth Street, South Boston, son of Thomas and Melvina; residence parents, Boston; father trunk maker by occupation, born in Kingston; mother, South Boston.” In this case the mother’s name in the record differed from the testimony of the witness. In the city directory for 1893 there are twenty-five William Mahoneys and four William H. Mahoneys. Against Morris McCarthey was put in the record of births as follows: “ 1873, December 29th, Morice McCarthey, male, son Morice McCarthey; residence parents, Boston; occupation, sawyer; father born Ireland, mother born Ireland.” Rice School record: Morice McCarthey, age eight years eight months, from primary; father Morice, 493 Harrison Avenue. The names of three of these persons, Sweeney, Fitzgerald and Quinn, appear on the nomination papers of the independent candidate, Quinn.
It will be seen that every one of these cases is an easy subject for investigation and for indictment, if the facts alleged are true. But on the simple disagreement between the record and the sworn statement a person should be slow to form a serious judgment in view of the fact that the records referred to are but statements of *77 information obtained, with many opportunities for mistakes. Mr. Rideout, first assistant city register, testified that he had been in office twenty-six years, that formerly birth statements were obtained by contract with Sampson, Davidson and Company. He says, “ They went out and made a house-to-house canvass; whatever facts they took they took to the office and then they made a copy for our office. The copy was brought to our office, and we then copied from that in our record, making another copy.” The company referred to was the city directory concern. The facts were collected but once a year, commencing January and ending about April 1. Since 1892 a new system has been adopted under which the parent signs a statement which is witnessed. Register Rideout was asked if he could swear that the records of 1870 were correct; his answer was, “ No, sir ; I wouldn’t do it.” The witness also testified that he did not know what became of the original statements made by the canvasser under the old system.
On this testimony the committee found that there were a number of instances of fraudulent registration; but not the number claimed by the petitioners.
The next class of cases is the one most relied upon in numbers and of all others is the most difficult of proof. We refer to the question of residence in Ward 17. The House will take notice of the fact that this ward contains a very large floating population, which, for brief periods, occupy rooms in the various apartment houses there situated. A legal voter is a person who has become emancipated from his parents, and may acquire a domicile for himself in a new ward within the time occupied by him in moving his effects. The law itself is not easily defined. Vattel defines domicile to be, “ fixed residence in any place with an intention of always staying there.” Of this Judge Story remarks, “This is not an accurate statement. It would be more correct to say that that place is properly the domicile of a person in which his habitation is fixed without any present intention of removing therefrom.” Of this Mr. Hoar says, in Cessna v. Meyers, “But certainly Judge Story’s definition is not much better. A man’s domicile remains after he forms the intention of removing therefrom, and sometimes even after he removes, until he gets another.” Under our law a man must live in a State two years, and in a city or town six months, before he can vote. But having acquired a residence within the city he may acquire a new domicile in another ward in twenty-four hours. A man may have a legal residence in Ward 16 April 80, a legal residence in Ward 17 May 1, and remove and make up his domicile in Cambridge May 2, and for six months thereafter he may return and vote in Ward 17 ; or, if he does not *78 abandon Ms residence in Ward 17, be may wander on tbe face of the earth for ten years and still come back and claim his residence in that ward.
[Upon the report of the committee, Mr. Bailey moved to substitute for the recommendation therein, leave to withdraw, the following resolution: —
Whereas, Upon due investigation it is proven conclusively that there was “a concerted action to corrupt the election” held on November seven, eighteen hundred and ninety-three, in the seventeenth Suffolk representative district; that there was a “ systematic attempt to register minors and to have them vote, and that minors voted in the election without the shadow of a right; that there was a concerted action to secure votes of non-residents, and of those who were not citizens ; ” that votes were cast by “ nonresidents,” and persons who “ were not citizens that voters were “registered by other parties;” that votes were cast by persons who “ could not read or write,” and who were not within the statutory exemptions; that there were “instances of personation of voters who were either absent from the city or who were denied the right to vote because that prerogative had been exercised for them before they claimed it; ” that there was personation of those who could not vote because of prior engagements in penal institutions of the Commonwealth; that ‘ ‘ a number of those claiming residence in the stables at the rear of No. 492 Harrison Avenue ” were not entitled to vote, and therefore “ their votes were illegal; ” that the “ illegal votes” above classified were “ not a spontaneous product,” but were “the result of careful cultivation;” that the sitting members were guilty of issuing, in the course of their campaign, a circular misrepresenting the petitioner Hutchinson as to his record upon certain public questions as a member of a previous Legislature, a statement proven to be false, upon a m atter vitally affecting the campaign, an act which admits neither palliation nor excuse ; “ that there was gross fraud in the acts or negligence of the election officers of precinct five in the mutilation of ballots with respect to representatives ; ” “ that a large number of ballots were so mutilated, — marked in the compartment designated for representatives with extra marks, tending to render void the expression of the voter in that one respect, — the grossest outrage that could be committed upon the elective franchise ; ” and
*78 There certainly must be an intent of some kind to make the new place a home, and some act in furtherance of that intent; as a person’s intent is not always legible in his acts, the determination of domicile is a complicated problem.
A man’s legal residence is his domicile, involving the essential idea of a home. In contemplation of law every man has a domicile with this implication, and yet a man may stand in the streets for lack of a place to lay his head in the district of his legal residence. He may, of course, become a vagrant by sleeping in barns, but poverty alone does not bereave a man to the extent of taking away his citizenship. These suggestions are made simply to call to mind the difficulties which the committee encountered in the investigation required of them. The surest means of deterring people from committing offences of this kind is a punishment for the offence before tribunals wherein every man’s rights, including the accused, are protected; but whenever a committee of the General Court are called upon under the Constitution to assume the character of judges, they must see to it that in that capacity they preserve the candor and equanimity and the freedom from party prejudice that will insure justice without fear or favor.
Whereas, It is impossible to eliminate the fraud and to determine whether any persons were lawfully elected to the House in said district; and the title of the sitting members to seats in the House is impeached by proof of gross and varied fraud committed in their interest in said election ;
Resolved, That the seats now occupied by James H. Doyle and Richard J. Hayes as representatives from the seventeenth Suffolk representative district are hereby declared vacant. — House Journal, 1894, p. 1192.
After debate the resolution was substituted for the recommendation of the committee upon a yea and nay vote of 122 yeas to 91 nays. — House Journal, 1894, p. 1199.
The question coming upon the adoption of the resolution so substituted, it was voted to divide the resolution, and that the vote be taken as upon two resolutions, with the above preamble, — the first declaring the seat of Mr. Doyle vacant; the second declaring the seat of Mr. Hayes vacant. Thereupon the first resolution was adopted upon a yea and nay vote of 113 yeas to 84 nays, and the second resolution was rejected upon a yea and nay vote of 84 yeas to 95 nays. —House Journal, 1894, pp. 1202, 1204.
Upon motion to reconsider the rejection of the second resolution, the House refused to reconsider upon a yea and nay vote of 85 yeas to 102 nays. Upon motion to reconsider the adoption of the first resolution, the House refused to reconsider upon a yea and nay vote of 85 yeas to 105 nays. — House Journal, 1894, pp. 1210, 1213.]